UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 4:10-CV-57-H

PENNY LEONARD                                                                                          PLAINTIFF

V.

DOLGENCORP INC., et al.                                                                         DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff, Penny Leonard, alleges that Defendant, Dolgencorp, Inc. (the "Company" or "Dollar General") violated the Fair Labor Standards Act ("FLSA") by not paying her for overtime hours. After completion of discovery, Dollar General has now moved for summary judgment on the grounds that Leonard was exempt from FLSA's overtime pay requirements under its "execution exemption." Plaintiff vigorously opposes the motion. To exempt Leonard, Dollar General must show that Leonard's primary duty is management.

Recently, in *Thomas v. Speedway SuperAmerica*, 506 F.3d 496 (6th Cir. 2007), the Sixth Circuit set out a clear roadmap for determining this very question. The Court will follow this roadmap, noting that the facts in *Speedway SuperAmerica* are quite similar to those here.

I.

The Court finds no significant dispute about the relevant facts, only about the legal conclusions which a court might draw from them. The Court will describe the facts in a light favorable to Leonard.

The Company is a retailer of basic low priced consumer goods. By 2010, the Company operated approximately 8,800 stand-alone Dollar General stores in 30 states, with an average

annual sales volume over $1 million per store. Much of the merchandise is priced at less that $10 per item.

The Company operates on a lean staffing model. Each store has a Store Manager, whom Dollar General designates as the only exempt, salaried employee in the store. Ordinarily, each store is staffed with an assistant store manager ("ASM"), a Lead Clerk, and multiple store clerks, all of whom are hourly employees. Thus, the average store has about 7-8 employees, 4-5 of whom were clerks. Each Store Manager reports to a District Manager. According to Dollar General, District Managers oversee approximately 15 to 25 stores.

Dollar General operates its stores according to its own specific Standard Operating Procedures ("SOP"). Store Managers are responsible for implementing the SOP at each store. They receive directives through store mail. Generally, they are responsible for recruiting, hiring, training, and evaluating regular employees; making recommendations regarding employee status such as pay, promotions and termination; scheduling employees; assigning work; evaluating operations statements; ordering merchandise; maintaining proper stock levels; stocking and storing merchandise; maintaining inventory levels by managing markdowns and damages; completing daily paperwork; monitoring the store's financial integrity; providing customer service leadership; and implementing and enforcing company policies.

As a general matter, Store Managers carry out many of their responsibilities strictly according to the SOP and they receive varying degrees of oversight from District Managers. Store Managers do not have authority to terminate employees, unilaterally hire employees, set starting pay rates, give pay raises, promote or demote employees, change store hours, change store locks or independently order store merchandise.

Dollar General hired Leonard as a clerk in October 1996. She left the company in 2000 and returned in 2001 as an ASM. She was promoted to Store Manager approximately six months later at Store No. 7660 in Nortonville, Kentucky. In June, 2005, she transferred to Store No. 7794 in Madisonville, Kentucky and a year later transferred again to Store No. 10567 in Crofton, Kentucky. Thus, Leonard remained employed continuously as a Store Manager from 2001 to March 2007, except for the six-month period when she voluntarily stepped down to an ASM role.

Leonard has confirmed that while serving as the Store Manager, she was in charge on a day-to-day basis, stating that "I made sure everything was done. It was down to me. I'm the one that had the responsibility[.]" She was responsible for enforcing the SOP in her store. She ordinarily prepared the store's schedule, but sometimes delegated this task to ASMs. As Store Manager, Leonard spent approximately one hour each week performing personnel scheduling. She was also responsible for verifying and submitting the store's payroll.

When Leonard went on vacation, an ASM would run the store. Even when on vacation, Leonard would still receive phone calls from store employees with questions when they "didn't know exactly how they were supposed to do" something and were looking for instructions. Leonard said that, although her ASM was expected to run the store in her absence, when that actually happened, the ASM was not as effective as her.

Leonard worked between 60 and 80 hours per week. She spent only about 30% of her time performing functions that were strictly "managerial" in nature. Consequently, she spent a majority of her time performing non-managerial and non-supervisory functions. A significant amount of every employee's time, including the Store Manager, involves unloading and stocking

merchandise. Consequently, the job of Store Manager requires frequent bending, stooping, and lifting. Leonard's other manual labor activities included cleaning bathrooms and mopping floors. However, whenever Leonard worked at the store, she was always supervising at least one other person, and sometimes many others.

Leonard assigned the work among her employees in her store each day, though the tight store labor budget limited her discretion to apportion employee hours. Leonard's labor budget was typically 150-200 hours per week, not including her own time. She was responsible for apportioning these hours among the employees. The payroll limitation has many effects: necessary work is late; tasks are not performed well; customer service suffers; and Store Managers work longer hours. Dollar General's rules appear to have prohibited the Store Manager from allowing employee overtime.

Leonard spent approximately five percent of a typical workweek hiring new employees. Between 2001 and 2007, Leonard made about 50 hiring decisions. The hiring process involved first reviewing applications, evaluating them and deciding on call backs, conducting interviews, and finally making a hiring recommendation. Leonard's District Managers did not interview clerks, but would interview applicants for "key carrier" positions – ASM and lead clerk. She communicated job offers and ordered background checks. She also completed legally-required tax and immigration forms for employees hired at her store and inspected documents showing that the employees were authorized to work in the United States. The only limitation on her discretion to hire clerks was the background check and the District Manager's final approval.

Leonard was responsible for proper cash handling procedures at her store and would monitor daily reports showing cashier shortages, voids and refunds. Part of her responsibility

was to monitor theft risks by perpetually "watching the store, watching the employees [and], watching the customers." Leonard agrees that if the store was losing money, she would attempt to determine how to stop it. Leonard also called the police to make an arrest when a customer was seen putting merchandise in her purse.

Leonard was paid a weekly salary. She was also eligible for certain quarterly and annual bonuses. These bonuses are tied to the financial and operational performance her own store and individual performance. She was evaluated annually on store performance and leadership skills. The evaluation criteria include: sales volume, inventory shrink, safety awareness, training and development, controllable expenses, customer satisfaction and merchandising. These ratings impacted both raises and bonuses.

In 2001 Leonard earned $470 per week; in 2002, $484.10; in 2003, $503.46; in 2004, $540.38; in 2005, $584.48; in 2006, $607.86. On an annualized basis, this translated to a salary that increased from $24,440 to $31,608.72. She earned bonuses each year under performance criteria which included the store's sales profitability, store ratings, shrink level, controllable expenses, and management of inventory. Those bonuses were $4,839 and $518 in 2002; $10,000 in 2003; $5,000 and $250 in 2004; $1,125 and $1,627 in 2006; and $791 in 2007. Thus, Leonard's average annualized Store Manager compensation, including salary and bonuses, reached over $32,000 in 2005 and 2006.

At various times, Carol Woodard, Debbie Browning and Nancy Payne served as ASMs working for Leonard. They earned $7.25 per hour in 2001 and 2002; $7.54 in 2003; $7.84 in 2004; $7.50 in 2005 and 2006. Clerks, the largest component of the store's roster, generally earned an amount close to the minimum wage, usually between $5.35 and $5.50 per hour

5

between 2001 and 2006. ASMs generally worked no more than 40 hours per week and Leonard agrees that she would not have wanted her ASM working more than 40 hours for expense control reasons. Thus, on an annualized full-time basis, ASMs could have earned as much as $16,000 per year plus a limited bonus potential.

The evidence of District Manager supervision is not in great dispute, though the implications of it are. From 2004 through 2007, Leonard's District Manager was Kathy Tinkham ("Tinkham"). Tinkham's visits to Leonard's store varied in frequency and duration. At times, Tinkham visited the store once a week for about an "hour at the most" each time. Some of Tinkham's visits were not to supervise Leonard, but to conduct a district meeting or to interview other Store Manager applicants or candidates. The most common purpose of Tinkham's visits was to discuss merchandising. Joy Garcia, the District Manager prior to Tinkham, visited Leonard's store about once a month for an hour or two.

Every District Manager sent Leonard a daily voice mail which focused on company merchandising plans for the stores in the district. Leonard attended monthly meetings with the District Manager and her district's other Store Managers, which the ASMs and other hourly employees did not attend. The District Managers did not observe Leonard's work for any period greater than 20 to 30 minutes per week and did not possess a key to her store.

Leonard exercised discretion in many areas of employee relations. Leonard performed some employee training as time permitted. She would correct an employee working in an unsafe manner and instructed store employees how to deal with hazardous conditions in the store. She trained her employees to "look at everybody that comes through the door so they know who is in the store with them" in order to prevent shoplifting and for their own safety awareness. She

6

performed limited discipline.  She would rarely write up employees. Typically, she gave employees undocumented verbal counseling several times before documenting performance issues in writing.  For the most part, she maintained a "good group of employees" who did not require frequent written discipline.

Leonard said that "manual labor" was the most important part of her job.  She performed the purportedly more labor-intensive "opening" shift, while the ASM handled the easier "closing." This scheduling decision – made exclusively by Leonard – was based on her opinion that an ASM was not paid enough.  Leonard was the leader of her store, had responsibility for everything in it, and was the person "in charge" of the store on a day-to-day basis.

II.

The Company has moved for summary judgment and it is an interesting question precisely how the Court should handle it.  Before the Court are issues of fact and law.  This Court has thoroughly reviewed how many other courts have dealt with these distinctions. Sometimes the parties in other cases have disputed how much time a Store Manager devotes to management tasks.  Here, the parties agree–it is about 30%.  Balancing this with other factors and determining whether an employee's particular activities exclude her from overtime benefits of the FLSA is a question of law.  *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *see also Nielsen v. DeVry, Inc.*, 302 F.Supp.2d 747, 752 (W.D.Mich. 2003) ("the question of how an employee spends his time is a question of fact, while the question of whether his activities fall within an exemption is a question of law").

Dollar General does not dispute Leonard's stipulations concerning either her responsibilities as Store Manager or her claim that she worked overtime without compensation.

Rather, it asserts the affirmative defense that Leonard was exempt from overtime pay under the FLSA because she was an executive employee under the same regulations. Consequently, the issue for this Court to decide is whether Leonard is properly classified as an executive-employee under the FLSA. The overtime exemption is an affirmative defense on which the employer has the burden of proof. *Speedway SuperAmerica*, 506 F.3d at 501. That burden requires Dollar General to prove its defense by a preponderance of the evidence. *Id.* at 502.[1]

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). In reviewing a motion for summary judgment, we view the evidence, all facts and any inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." *Prebilich-Holland v. Gaylord Entm't Co.,* 297 F.3d 438, 442 (6th Cir. 2002).

III.

The Secretary of Labor has adopted regulations defining a bona fide executive employees. *See* 29 U.S.C. § 213(a)(1). Those regulations say that an employee qualifies as a bona fide executive if: (1) she is "[c]ompensated on a salary basis at a rate of not less than $455 per week"; (2) her "primary duty is management of the enterprise in which [she] is employed or of a customarily recognized department or subdivision thereof"; (3) she "customarily and

---

[1] Of course, were Defendant to fail in its burden to prove the exemption as a matter of law, a jury would determine the question of the number of overtime hours for which Leonard was entitled to compensation.

regularly directs the work of two or more other employees"; and (4) she "has the authority to hire or fire other employees," or her "suggestions and recommendations as to the hiring, firing, advancement, promotion [,] or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a) (2007). Here, only the second element is disputed; the other three are clearly established. The issue before this Court, then, is whether Leonard had management as her primary duty while she was employed as an individual store manager.

The Sixth Circuit has said that the Secretary of Labor's regulations provided "detailed guidance" for interpreting the terms "management" and "primary duty." *Speedway SuperAmerica*, 506 F.3d at 503. Although the *Speedway* court considered the 2003 regulations; the 2007 regulations, which govern here, are quite similar. *Id*.

The current regulations define "management" as generally including but not limited to:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102 (2007).

The current regulations also define the term "primary duty" as

> the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty

9

> must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.
>
> The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

29 C.F.R. § 541.700(a-b).

The regulations also identify the four factors which determine the primary duty of an employee: (1) "the relative importance of the exempt duties as compared with other types of duties;" (2) "the amount of time spent performing exempt work;" (3) "the employee's relative freedom from direct supervision;" and (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* If anything, the revised regulations place less emphasis on the time spent on non-exempt work and the degree of indirect supervision, and place more emphasis on the actual importance of an employee's exempt work. The Court will consider each factor in turn and then summarize its conclusion in Section IV.

A.

The first factor considers the "relative importance of the exempt duties as compared with other types of duties." 29 C.F.R. § 541.700(a). Under this factor, the Court must compare the importance of Leonard's managerial duties with that of her non-managerial duties, keeping in mind the end goal of achieving the overall success of the company. *See Donovan v. Burger King*

10

*Corp. (Burger King II)*, 675 F.2d 516, 521 (2nd Cir. 1982) (noting that this factor requires a consideration of which responsibilities are more "important or critical to the success of the [business]"). *See Speedway SuperAmerica*, 506 F.3d at 505.

Leonard spends about 70% of her time on manual labor or non-management issues. She argues strenuously that this amount of time is so significant here that it overwhelms all other factors. On a day-to-day basis, Leonard performs many of the same jobs as clerks at the store because each store operates on a strict payroll budget, she must perform many regular duties along side the other employees. At the very least, she argues, a jury must be given an opportunity to decide whether her management duties are really that important in these circumstances.

Dollar General makes a strong case, however, that even a small store could not function without one person actually taking responsibility for essential tasks. These responsibilities include, hiring clerks, managing and scheduling employees and accounting for receipts. Some of these tasks take place in close consultation with District Managers, such as disciplining and terminating employees, ordering and tracking merchandise and taking direct responsibility to tasks assigned by the District Manager. However, the District Managers are present only infrequently.

The facts are relatively undisputed; the weighing of their importance is for the Court. The Court concludes that the Dollar General store could not effectively operate without Leonard functioning as the Store Manager. Her management duties are absolutely critical to day-to-day store operation. Without her, no one else had the ongoing responsibility to direct on-site actions. Anyone can do the manual labor, but someone must be responsible for overall operations and

that someone is not the District Manager. Even though she may have performed non-managerial work a majority of the time, successful management of Leonard's store depended totally on her own decision-making and judgment. Accordingly, the Court finds that the relative importance of Leonard's management responsibility exceeds those of her more time-consuming non-management activities.

B.

The second factor examines the "amount of time spent performing exempt work." 29 C.F.R. § 541.700(a-b). The same arguments which Leonard makes on the first factor reappear here in similar form. The argument is more direct: a good rule of thumb is that the primary duty is determined by how an employee spends a majority of her time. However, the regulation is similarly direct: "[t]ime alone ... is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." *Id.*; *see Burger King II,* 675 F.2d at 521. In particular, the FLSA, recognizing the nature of the retail business, exempts retail executives from the requirement that the majority of their hours be spent on executive functions. 29 U.S.C. § 213(a)(1). *See Speedway SuperAmerica*, 506 F.3d at 504.

Leonard argues that only 30% of her time was spent on managerial acts, with the rest spent on the same work done by hourly employees. However, in *Murray v. Stuckey's Inc. (Murray I)*, 939 F.2d 614, 618 (8th Cir. 1991), the court held a "district court's finding that the managers spent 65-90 percent of their time on non-managerial duties ... is not a controlling factor under the regulations". Additionally, this breakdown of time might be "somewhat misleading", where "the employee's management and non-management functions are [not] clearly severable." *Donovan v. Burger King Corp. (Burger King I)*, 672 F.2d 221, 226 (1st Cir. 1982).

12

This Court agrees with this assessment. As the person in charge on a regular basis, Leonard exercised daily discretion over many small matters. What has been said elsewhere remains true here: she is always supervising and always in charge. *See Speedway SuperAmerica*, 506 F.3d at 506-507. Further, the Department of Labor's regulations explicitly recognize her multi-tasking – performing management and nonexempt work simultaneously – as a managerial duty. Those regulations recognize the significance of a retail manager performing concurrent management duties:

> For example, an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management. An assistant manager can supervise employees and serve customers at the same time without losing the exemption. An exempt employee can also simultaneously direct the work of other employees and stock shelves.

29 C.F.R. § 541.106.

Leonard exercised discretion on a sufficiently frequent basis to support a finding that management was a constant responsibility.

C.

The third factor concerns the employee's "relative freedom from direct supervision." 29 C.F.R. § 541.700(a); *Speedway SuperAmerica*, 506 F.3d at 507. Assuming that the District Manager did monitor Leonard's performance by calling daily and visiting even once a week, Leonard remained free of direct supervision for most of her time on the job. Leonard was the most senior employee at her station; no other on-site employee was her equal. Thus, on a day-to-day basis, she generally operated without a supervisor looking over her shoulder or monitoring her every move.

13

A "local store manager's job is [no] less managerial for FLSA purposes simply because. . . she has an active [district manager]." *Murray I*, 939 F.2d at 619. None of the District Manager's various forms of oversight or assistance – weekly visits, frequent calls and emails, or constant availability – demonstrate that Leonard did not have "relative freedom from direct supervision." A District Manager's periodic visits do not negate a finding that the store manager operates free from supervision when the District Manager is absent. *See Horne v. Crown Cent. Petroleum, Inc.*, 775 F.Supp. 189, 191 (D.S.C. 1991) (finding that a store manager "was relatively free from direct supervision" where her "supervisor came by her store only a few times a week"); *Murray I*, 939 F.2d at 619 ("The mere fact that a [District] supervisor comes in for a one- or two-day visit does not destroy the [store manager's] sole charge status . . . during the intervals when the superior is absent"). Neither does a store manager's frequent, even daily, exchange of email and phone communications with her District Manager suggest that Leonard was subject to "exacting supervision." *See Moore v. Tractor Supply Co.*, 352 F.Supp.2d 1268, 1277-78 (S.D.Fla. 2004) (finding that a store manager was not "subject to exacting supervision" where his "District managers visited the store approximately once a week for a 'walk thru,'" and where "any other communication [p]laintiff had with his District managers was via telephone or email"). *See Speedway SuperAmerica*, 506 F.3d at 507-08.

Furthermore, the level of supervision here differs significantly from those in cases in which courts have found that retail store managers were not exempt executives under the FLSA. *Compare Smith v. Heartland Auto. Servs., Inc.*, 418 F.Supp.2d 1129, 1137 (D.Minn. 2006) (denying defendant's motion for summary judgment regarding executive exemption for Jiffy Lube store managers where the company's District Managers "were at the stores almost every

day of the week for hours at a time") *and Cowan v. Treetop Enters., Inc.*, 120 F.Supp.2d 672, 675 (M.D.Tenn. 1999) (granting plaintiffs' motion for summary judgment and finding that plaintiffs were not exempt executives where Waffle House restaurant unit managers "report[ed] directly to a District manager who usually has responsibility for three restaurant units in a defined geographical area") (emphasis added) *with Posely v. Eckerd Corp.*, 433 F.Supp.2d 1287, 1304 (S.D.Fla. 2006) (distinguishing *Cowan* and granting summary judgment to defendant, a retail pharmacy chain, where its District managers "supervised over 15 stores at any given time") *and Light v. MAPCO Petroleum, Inc.*, No. 3:04-0460, 2005 WL 1868766, at *9 (M.D.Tenn. Aug. 4, 2005) (granting summary judgment to defendant where plaintiff managed a gas station and the District manager "supervised an average of twelve different stores at a time"). *See Speedway SuperAmerica*, 506 F.3d at 508.

Despite the involvement and monitoring of the District Manger, Leonard operated free from direct over-the-shoulder oversight on a day-to-day basis. The Court concludes that this relative freedom from supervision strongly supports a finding that her primary duty was management.

D.

The final factor contemplates the "relationship between the employee's salary and the wages paid other employees for the kind of nonexempt work performed by the employee". 29 C.F.R. § 541.700(a); *Speedway SuperAmerica*, 506 F.3d at 508.

The facts are known. In 2006, Leonard's weekly salary was about $607, which equates to an annual salary of $27,583. She received an annual bonus of $4,583 and several "stock" bonuses of $500. Therefore, her total compensation for the year equaled $32,666. The evidence

is that an ASM working full-time for that year would earn about $16,000. ASMs usually do not work more than 40 hours per week; Leonard did. Thus, it appears as though Leonard earned about twice the salary of an ASM. This analysis suggests that Leonard's responsibilities were more important to store performance and extended significantly beyond those of an ASM, who also performed some managerial duties.

Leonard argues that if one figured her actual hourly rate of pay, it may not be significantly different from an ASM. Certainly, the pay comparison between the two would be more even on an hourly basis. However, Leonard's hours reflect her greater responsibility and provide her the opportunity to earn more. The structure of her compensation – that is, the substantial bonus opportunity – further reflects her central role in the store as a profit center. All of the discretion, authority and leadership she exercised was viewed as contributing to store performance. As such, she was paid accordingly.

This evidence establishes that Dollar General paid Leonard a significant amount more than its non-exempt employees based upon her additional management responsibilities. This is strong evidence that her primary and overarching responsibilities were management.

IV.

Many courts have considered the question of whether Dollar General Store Managers and other convenient type store managers are exempt from the FLSA's overtime pay requirements. A significant majority of these courts seem to have come down in favor of the exemption. Those results, however, are immaterial here. All that matters is the evidence and testimony in this case compared to the required legal standard.

As the preceding discussion suggests, all the factors taken together quite overwhelmingly

suggest that Leonard's primary duty is management as the FLSA defines it.  First, her exercise of actual management responsibilities is far more important than a time comparison.  Indeed, but for the exercise of those duties, the store could not function day to day.  Even though she spent less than 50% of her time on management activities, the constant exercise of her responsibilities was essential to the success of the store.  Second, the evidence clearly established that Leonard is relatively free from direct supervision as to her day-to-day management functions.  The guidance and consultation which the District Manager may provide does not amount to active supervision under our cases.  Finally, Leonard's pay scale suggests that she has responsibilities far more significant than those with whom she may share common chores.

The sole factor which might weigh against Leonard's exempt status is that she spends only 30% of her time specifically on management duties.  However, many courts and the applicable FLSA regulations have said that the actual time split between managerial and non-managerial duties is not determinative.  Moreover, the actual time is misleading.  When on the job, Leonard is always the leader, always in charge and always responsible to higher management.

The Court concludes, therefore, that Defendant has met its burden of establishing as a matter of law that Leonard's primary duties are management. The Court will enter an order consistent with this Memorandum Opinion.


cc: Counsel of Record